Kathryn A. PIPER, Plaintiff, Appellee,

v.

**SUPREME COURT OF NEW HAMP-
SHIRE, Defendant, Appellant.**

No. 82–1548.

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1982.

Decided May 25, 1983.

Martin L. Gross, Concord, N.H., with whom Sulloway Hollis & Soden, and Martha V. Gordon, Asst. Atty. Gen., Div. of Legal Counsel, Concord, N.H., were on brief, for defendant, appellant.

Jon Meyer, Concord, N.H., with whom Law Offices of Robert A. Backus, Manchester, N.H., were on brief, for plaintiff, appellee.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The issue raised by this appeal is whether New Hampshire Supreme Court Rule 42 requiring that applicants to the state bar reside within New Hampshire is constitutional. We find that it is.

Plaintiff-appellee Kathryn A. Piper lives in Lower Waterford, Vermont, less than 400 yards from the New Hampshire border. She is admitted to the state bar of Vermont. In 1979 she applied for permission to sit for the February 1980 New Hampshire Bar Examination, signing a statement of intent to establish residence in New Hampshire, as required by Rule 42.[1] After investigation, the New Hampshire Board of Bar Examiners found her to be of good moral character and approved of her request. She took the examination and was notified on April 18, 1980 that she had passed it and would become eligible for admission to the bar upon establishing a residence in New Hampshire.[2]

Piper then sent a letter to the clerk of the New Hampshire Supreme Court requesting an exception to the state's residency requirement based upon changed personal circumstances, most particularly the recent birth of a child. On May 13, 1980, the clerk of the court informed her that her request had been denied. On November 8, 1980, Piper filed a "formal petition" to the Supreme Court repeating her request for an exception. The petition was denied on December 31, 1980.

On March 22, 1982, Piper filed a complaint in the United States District Court for the District of New Hampshire, alleging that New Hampshire's bar residency requirement deprived her of the privileges and immunities of citizenship guaranteed in article IV of the Constitution, burdened interstate commerce, and violated the equal protection clause. A pendent state law claim, charging that the Supreme Court's Rule violated N.H.Rev.Stat.Ann. 311:2, was also alleged.

1. Rule 42 states in part that

Any person domiciled in the United States and who either is a resident of the State of New Hampshire or filed a statement of intention to reside in the State of New Hampshire shall be eligible to apply for examination provided he is possessed of qualifications hereinafter provided.

According to an affidavit filed by Chief Justice John W. King, this rule has been interpreted to require that an applicant to the New Hampshire bar be a bona fide resident of the state at the time that the oath of office is administered.

*See Piper v. Supreme Court of New Hampshire,* 539 F.Supp. 1064, 1066 (D.N.H.1982).

2. A resident of New Hampshire is one who "is domiciled or has a place of abode or both in this State and in any city, town or other political subdivision of this State, and who has, through all of his actions, demonstrated a current intent to designate that place of abode as his principal place of physical presence for the indefinite future to the exclusion of all others." N.H.Rev.Stat.Ann. 21:6.

The district court, on a motion for summary judgment, found that Rule 42 violated the privileges and immunities clause. *Piper v. Supreme Court of New Hampshire,* 539 F.Supp. 1064 (D.N.H.1982). Observing that bar regulations were subject to due process and equal protection review, the district court first reasoned that the special deference normally accorded states in governing their own bar could not exempt Rule 42 from conventional privileges and immunities review. *See Piper,* 539 F.Supp. at 1071, *citing In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (equal protection), and *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 288 (1957) (due process claim). Then, applying the standard privileges and immunities clause analysis as set forth in *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), the district court found the rule unconstitutional, holding that it discriminated against nonresidents who were not shown to "constitute the peculiar source of the evil" the rule addressed, and that it was not "closely tailored" to meeting its objectives, ensuring that members of the New Hampshire bar were ethical and competent.[3] *Piper,* 539 F.Supp. at 1072–74, *citing Hicklin v. Orbeck,* 437 U.S. at 525–28, 98 S.Ct. at 2487–2488.

## I.

We believe that principles of federalism require giving greater weight than did the district court to the right of each state court to set bar standards, including bar residency standards.[4] The legal profession has certain distinguishing features, in particular a unique relationship, grounded in the history of our nation, with the judicial branch of the state by and before which a particular lawyer is licensed to practice. To hold that henceforth the highest court of the state lacks constitutional power to enact requirements like those embodied in New Hampshire Supreme Court Rule 42 would signal a major modification in the distribution of powers under our federal system—a rearrangement not contemplated in any of the cited precedents construing the privileges and immunities clause.

The privileges and immunities clause of article IV of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[5] The clause, placed along side the commerce clause in the Constitution, was designed to serve the essential role of fusing the several states into one nation and to preserve the "structural balance essential to the concept of federalism." *Austin v. New Hampshire,* 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). *See Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). Towards this end, the Supreme Court has held violative of the clause "state discrimination against nonresidents seeking

**3.** The district court also held that it was not bound by the Supreme Court's summary affirmance in *Wilson v. Wilson,* 430 U.S. 925, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977), (mem.), *aff'g,* 416 F.Supp. 984 (D.Or.1976), because although the issue was raised before the Supreme Court, the lower court in that case did not decide whether or not the privileges and immunities clause prohibited a bar residency requirement. *Piper,* 539 F.Supp. at 1068–71. *Accord Stalland v. South Dakota Board of Examiners,* 530 F.Supp. 155 (D.S.D.1982). *But see Canfield v. Wisconsin Board of Attorneys Professional Competence,* 490 F.Supp. 1286 (W.D.Wis. 1980), *vacated,* 645 F.2d 76 (7th Cir.1981).

**4.** After oral argument was heard in this case, the Supreme Court decided *District of Columbia Court of Appeals v. Feldman,* 458 U.S. 1105, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1983).

Appellant has suggested to us that *Feldman* requires the dismissal of the instant case for lack of jurisdiction. We disagree. *Feldman* holds that a federal district court may not sit in review of a state court's application of a bar requirement to a particular individual's case. *Feldman* indicates, however, that federal courts have jurisdiction to hear generalized constitutional challenges to state bar rules. *Piper's* challenge is generalized. She does not question that Rule 42 applies in her case, but rather contends that such a residency requirement is unconstitutional in all cases.

**5.** Although by its terms the clause applies only to the privileges and immunities of citizens, it has been construed to apply equally to the privileges and immunities granted state residents. *See Hicklin v. Orbeck,* 437 U.S. 518, 524 n. 8, 98 S.Ct. 2482, 2486 n. 8, 57 L.Ed.2d 397.

to ply their trade, practice their occupation, or pursue a common calling within the State." *Hicklin v. Orbeck,* 437 U.S. 518, 524, 98 S.Ct. 2482, 2487, 57 L.Ed.2d 397 (1978). In *Hicklin* the Court struck down a state law favoring qualified Alaska residents over nonresidents for jobs on the Alaska pipeline. The Court said that in order to justify such a biasing of employment opportunities, Alaska had to show that the burdened noncitizens were "the peculiar source of the evil" which the statute sought to alleviate. *Hicklin v. Orbeck,* 437 U.S. at 525–26, 98 S.Ct. at 2487–2488, *citing Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). In addition, the statute had to be "closely tailored" to the problem it addressed. Under this latter requirement, the Court looked to whether there were alternate methods of reaching the state's goal that would be less burdensome on nonresidents. 437 U.S. at 526–27, 98 S.Ct. at 2487–2488.

Until the last few years, no court to our knowledge has ever suggested that the privileges and immunities clause stripped a state's supreme court of the power to limit bar membership to state residents. Recently, however, a number of courts, like the district court in the present case, have analyzed bar residency requirements in terms similar to those set forth in *Hicklin. E.g., Stalland v. South Dakota Board of Bar Examiners,* 530 F.Supp. 155 (D.S.D.1982); *Sheley v. Alaska Bar Association,* 620 P.2d 640 (Alaska 1980); *Gordon v. Commission on Character and Fitness,* 48 N.Y.2d 266, 422 N.Y.S.2d 641, 397 N.E.2d 1309 (N.Y.1979). Viewing the practice of law as indistinguishable from other private callings, these courts have applied the rigorous two-part test discussed in *Hicklin* to bar residency requirements. *See also Strauss v. Alabama State Bar,* 520 F.Supp. 173 (N.D.Ala.1981); *Noll v. Alaska Bar Association,* 649 P.2d 241 (Alaska 1982); *Sargus v. West Virginia Board of Law Examiners,* 294 S.E.2d 440 (W.Va.1982). Not surprisingly, they have found that the requirements failed to satisfy this exacting scrutiny.

We do not believe, however, that the analysis developed by the Supreme Court in cases involving state restrictions upon other occupations is dispositive of the bar membership issue. The Supreme Court has pointed out that the privileges and immunities clause does not prohibit states from *ever* using state citizenship or residency to distinguish among persons. *See, e.g., Baldwin v. Montana Fish and Game Commission,* 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1977). "Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual states." *Id.* Precisely because the privileges and immunities clause was designed to preserve a *federal* system, there has to be some point where limitations linked to affiliation with a given state are accorded validity. Were the clause to forbid all distinctions made upon the basis of state citizenship, the concept of statehood would become meaningless. *See Baldwin v. Montana Fish and Game Commission,* 436 U.S. at 383, 98 S.Ct. at 1860; Varat, *State "Citizenship" and Interstate Equality,* 48 U.Chi.L.Rev. 487, 520 (1981). The idea of a sovereign state necessarily implies a political community of residents organized under laws to provide certain benefits and services to the community. Varat, *supra,* at 520. Consequently, it has always been assumed that states may base certain distinctions upon residency. *See Baldwin v. Montana Fish and Game Commission,* 436 U.S. at 383, 98 S.Ct. at 1860. As the Supreme Court stated in *Baldwin,*

> No one would suggest that the Privileges and Immunities Clause requires a State to open its polls to a person who declines to assert that the State is the only one where he claims a right to vote. The same is true as to qualification for an elective office of the State . . . . . Nor must a State always apply all of its laws or all its services equally to anyone, resident or nonresident, who may request it so to do.

*Id.* at 383, 98 S.Ct. at 1860 (citations omitted). *Cf. Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (equal protection not offended by state requiring voters to be bona fide residents); *Chimento*

v. *Stark,* 353 F.Supp. 1211 (D.N.H.1973) (seven-year residency requirement for governor does not violate right to travel), *aff'd mem.,* 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973).

██ These principles suggest that, when determining whether a state policy is valid under the privileges and immunities clause, one must take into account the policy's relationship to the state's ability to function as a unique sovereign entity. Where the policy in question is simply directed at various forms of private enterprise, the goal of national unification outweighs any threat to the state's independent existence. It is in such cases that the state is required to show a very strong and precise justification for any discrimination based upon citizenship. *E.g., Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (work related to oil pipeline); *Austin v. New Hampshire,* 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (commuter tax); *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (shrimp fishing). Where, however, the state policy is also closely tied to the state's ability to function as ·a sovereign government, we think the balance shifts, with the goal of national unity being then outweighed by the policy favoring maintenance of a *federal* system. In such cases, the literal mandate of the privileges and immunities clause may either have no applicability, or may be applied less rigorously. *Cf. Equal Employment Opportunity Commission v. Wyoming,* —— U.S. ——, ——, 103 S.Ct. 1054, 1061, 75 L.Ed.2d 18 (1983) (commerce clause limited where federal regulation addresses matters that are indisputable attributes of state sovereignty and impedes a state's ability to function in areas of traditional sovereign activity); *Hodel v. Virginia Surface Mining & Reclamation Association,* 452 U.S.

264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (same); *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (same).[6]

██ The relationship between control over state bar membership and a state's ability to function as a sovereign political body is very close. The bar is a vital component of. the state judiciary which, together with the executive and legislative branches, constitutes an essential ingredient of state government. Although not state employees, lawyers , have long been considered "officers of the court." This designation does not refer to the fact that lawyers are officials capable of exercising judicial powers, *see In re Griffiths,* 413 U.S. 717, 724, 93 S.Ct. 2851, 2856, 37 L.Ed.2d 910 (1973); *Cammer v. United States,* 350 U.S. 399, 76 S.Ct. 456, 100 L.Ed. 474 (1956), but rather to the fact that lawyers are closely associated with, and have important responsibilities to a state's court. In our adversary system, competent and dedicated lawyers are essential in order for a state's judicial system—undoubtedly one of the essential attributes of state sovereignty—to function properly. Thus, the Supreme Court has said that a state's interest in regulating lawyers is "especially great since lawyers are essential to the primary governmental function of administering justice . . . ." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975). *See also Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Accordingly, state bar regulations have usually been granted substantial deference by the federal courts. *See District of Columbia Court of Appeals v. Feldman,* —— U.S. ——, —— n. 16, 103 S.Ct. 1303, 1315 n. 16, 75 L.Ed.2d 206 (1983); *Middlesex County Ethics Committee v. Gar-*

---

**6.** Because of the close historical relationship between the privileges and immunities clause and the commerce clause, precedent under the latter may be useful in deciding cases under the former clause. *Hicklin v. Orbeck,* 437 U.S. at 531–32, 98 S.Ct. at 2490–2491. The dissent argues that the commerce clause cases cited are nevertheless inapposite here because they deal with limitations upon federal power. The dissent is of course correct that *National*

*League of Cities* and its progeny concern restrictions upon congressional power under the commerce clause. It does not follow, however, that they are inapplicable here. If congressional power under the commerce clause, which is generally considered plenary, is restricted by the demands of state sovereignty, then surely similar state interests must be respected when Congress has not attempted to legislate a national policy.

*den State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (Brennan, J., concurring).[7]

This special relationship between a state's bar and its judicial system militates against treating bar regulations challenged under the privileges and immunities clause as simply another species of regulation over private commerce.[8] Rather regulations promulgated by a state's highest court determining the qualifications of those entitled to practice before it and the inferior state tribunals deserve a very substantial degree of deference, as they go to the heart of a state's ability to identify itself as such and to function as a political entity. A state would be impotent indeed were it without power to require officers such as its own attorneys to owe it a citizen's allegiance.[9]

■ Accordingly where bar regulations are at issue we believe the strict test enunciated in *Hicklin* is not controlling, and that such regulations are valid so long as reasonably related to legitimate state objectives. We find support for our position in *Leis v. Flynt,* 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (per curiam). In that case two out-of-state attorneys challenged an Ohio court's refusal to grant them a hearing on their applications to appear *pro hac vice.* Although the Court there did not have occasion to decide the issue now before us, its analysis lends strength to the view that states are to be given considerable deference in regulating the practice of law in their state by nonresident attorneys. The Court first found that the out-of-state attorneys had no federally protected right to practice law in another state. The Court stated that "Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions. The States prescribe the qualifications for admission to practice and the standards of professional conduct." *Id.* at 442, 99 S.Ct. at 700. The Court further stated that a Second Circuit case, *Spanos v. Skouras Theatres Corp.,* 364 F.2d 161 (2d Cir.) (en banc), *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448

---

7. Of course, a state cannot regulate its bar in such a way as to deny an applicant freedom of speech, *see Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, or equal protection of the laws. *See In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910. But, even when a court reviews a first amendment attack upon a state bar regulation, a federal court must be mindful that "Admission to practice in a State and before its courts necessarily belongs to that State." *Schware,* 353 U.S. at 248, 77 S.Ct. at 761 (Frankfurter, J., concurring). Cf. *Middlesex County Ethics Commission v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (federal court should abstain from hearing first amendment challenge to a pending state ethics committee proceeding).

8. Piper cites *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) and *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), for the argument that the practice of law is merely a form of private commercial activity. We do not believe that these cases stand for any such proposition. In *Goldfarb* the Supreme Court held that a minimum fee arrangement established by a *voluntary bar association* violated the Sherman Act, 15 U.S.C. § 1. The Court's opinion made clear that it "intend[ed] no diminution of the authority of the State to regulate its professions." 421 U.S. at 793, 95 S.Ct. at

2016. In *Bates,* the Court held that a total ban on price advertising by attorneys violated the first amendment. The Court there emphasized the narrowness of its holding, a point which was made clear in *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), which held that states can ban in-person solicitation by lawyers seeking clients for profit. Cases arising under the first amendment appear to provide little guidance on how the privileges and immunities clause should be applied to state bar regulations. The first amendment has long been applied to bar regulations. *See, e.g., Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 288 (1957), and the unique problem in privileges and immunities clause cases of balancing state sovereignty with national unity is not presented in the first amendment area.

9. We, of course, do not suggest that a state bar cannot operate without a residency requirement. Many states have apparently abandoned such requirements in recent times—a point our dissenting colleague makes at the end of his opinion. The question is not whether a residency requirement is desirable but whether the judicial branch of each state may decide this question for itself, as has been done since the founding of the Republic.

(1966), which had found a New York *pro hac vice* regulation violative of the privileges and immunities clause was "limited if not rejected entirely" by *Norfolk & Western R. Co. v. Beatty,* 423 U.S. 1009, 96 S.Ct. 439, 46 L.Ed.2d 381, (mem.), *aff'g,* 400 F.Supp. 234 (S.D.Ill.1975), a case rejecting a constitutional challenge to the Illinois *pro hac vice* rule. *Leis v. Flynt,* 439 U.S. at 442 n. 4, 99 S.Ct. at 701 n. 4. While the full import of this statement for bar residency requirements is uncertain, it supports our conclusion that the rigorous privileges and immunities analysis utilized in the private employment area is inappropriate here. Had the traditional rigorous review been applicable in the *pro hac vice* cases, those regulations, even if they ultimately had been upheld, would have been subjected to a far more exacting scrutiny than they were.[10]

## II.

Under a less restrictive test, Rule 42 does not violate the privileges and immunities clause of the Constitution. The rule is reasonably related to furthering the state's legitimate interest in regulating the bar so as to assure the competence and moral character of its members. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572; *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796.

New Hampshire's bar residency requirement ensures that lawyers who practice within the state at least begin their practice there. While they may thereafter move away without forfeiting their bar membership, it seems reasonable to predict that most people who go to the trouble of qualifying for the bar in their state of residence do so with the expectation of remaining and practicing there.[11] It is also reasonable to conclude that as a result of that rule, New Hampshire lawyers are likely to be more familiar with local rules and concerns than they would otherwise be. More importantly, residents of the state are more likely than nonresidents to feel personally affected by the administration of justice within the state. Consequently, resident lawyers may feel more dedicated to their New Hampshire practice than would nonresident attorneys. This might not only lead resident attorneys to be more willing to accept pro bono cases and perform other forms of public service within the state, but it might also induce resident attorneys to practice a higher quality of law thereby improving the administration of justice within the state.

New Hampshire also argues that it would be easier for it to discipline miscreant lawyers who reside within the state than those who live elsewhere. Although it would be theoretically possible for the state to discipline nonresident attorneys, we see nothing unreasonable in the state's belief that its disciplinary apparatus would be more effec-

10. We find further support for our decision from the Supreme Court's summary affirmance in *Wilson v. Wilson,* 430 U.S. 925, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977), (mem.), *aff'g,* 416 F.Supp. 984 (D.Or.1976). While the district court in that case did not decide whether residency requirements violated the privileges and immunities clause, the issue was squarely presented in the appellant's jurisdictional statement to the Supreme Court. Although because of our decision we find it unnecessary to decide whether the district court here erred by finding that *Wilson* was not "binding" precedent, *see* note 3, *supra,* we believe that *Wilson* at least demonstrates the Supreme Court's disinclination to review rigorously bar residency requirements.

11. Piper places great emphasis upon the fact that New Hampshire does not strip an attorney of bar membership upon his moving out of

state. This, she argues, makes it possible for former New Hampshire residents living elsewhere to still practice there, with the potential for defeating some or even most of the purposes New Hampshire says are served by its residency rule. But the Supreme Court of New Hampshire might have concluded that not many New Hampshire lawyers will both pull up stakes and continue to practice in the state. And it might further believe that the bureaucracy required to keep track of such comings and goings would not be worth the trouble, especially since many moves out of state—to Washington, D.C., for example, to work for the government—may be of short duration. If we were to apply *Hicklin's* "closely tailored" language strictly, our conclusions might be different. But we think the bar residency rules of the highest court of a state need not pass through such a finegrain sieve.

tive and serve as a stronger deterrent if it did not have to rely upon asserting authority over nonresidents. Similarly, it might be easier as a practical matter to impose special "service" obligations upon bar members if the bar does not have a substantial nonresident component. If nonresidents are entitled to membership as of right, they are likely to feel they also have a right not to be forced to perform pro bono services in a state where they do not reside.

Furthermore, New Hampshire's residency requirement is not unreasonably burdensome. Applicants may take the New Hampshire bar examination prior to residing in New Hampshire. They are not required to move to the state before knowing whether or not they can practice there. *Compare Strauss v. Alabama State Bar,* 520 F.Supp. 173 (rule requiring applicants to live within state for three weeks prior to taking the bar violates the privileges and immunities clause); *Gordon v. Committee on Character and Fitness,* 48 N.Y.2d 266, 422 N.Y.S.2d 641, 397 N.E.2d 1309 (requirement to live within state six months prior to taking bar examination violates privileges and immunities clause). Nor are applicants to the New Hampshire bar required to reside within the state for any lengthy period of time before being admitted to the bar—and, indeed, they may leave soon thereafter. *See* note 11, *supra.* All the state requires is that the applicant reside within New Hampshire at the time of his or her admission. We do not find such a requirement at all unreasonable given its relationship to the state's legitimate goals. We therefore hold that Rule 42 does not violate the privileges and immunities clause.

### III.

Piper also raised claims under the commerce clause and the equal protection clause of the fourteenth amendment. Although the district court did not reach these claims, we believe it useful to discuss them briefly now.

Our analysis of the privileges and immunities clause claim readily resolves Piper's commerce clause claim. As was noted above, the two constitutional clauses, each found in article IV, share a related history and precedent under either of the clauses is useful in deciding cases brought under the other. *Hicklin v. Orbeck,* 437 U.S. at 532, 98 S.Ct. at 2491. We see no reason why our analysis under the privileges and immunities clause should not apply to Piper's commerce clause claim.

The finding that Rule 42 is related to a legitimate state goal also disposes of Piper's equal protection claim because she has asserted no discrimination against a suspect class warranting an enhanced form of review.[12] Moreover, federal courts that have considered equal protection challenges to bar residency requirements have uniformly upheld the requirements except in those cases in which the state imposed a lengthy durational requirement. *Compare Rose v. Bondurant,* 409 U.S. 1020, 93 S.Ct. 460, 34 L.Ed.2d 312 (1972) (upholding six-month residency requirement); *Kline v. Rankin,* 352 F.Supp. 292 (N.D.Miss.1972) (upholding 90-day residency requirement) *with Lipman v. Van Zant,* 329 F.Supp. 391 (N.D.Miss.1971) (one-year residency requirement violated equal protection clause); *Keenan v. Board of Law Examiners,* 317 F.Supp. 1350, 1360 (E.D.N.C.1970) (one-year residency requirement is unconstitutional). Because the New Hampshire rule imposes no durational requirement, it clearly does not violate the equal protection clause.

---

**12.** An enhanced form of review might arguably be justified if the rule infringed upon Piper's right of interstate travel. *See, e.g., Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Piper, however, can make no such claim. Non-durational residency requirements, such as the one in question, which permit out-of-staters to receive equal benefits as state residents upon moving into the state, do not infringe upon the right of interstate travel. *See McCarthy v. Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976) (per curiam). *Compare Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (Brennan, J., concurring) (right to travel infringed upon where state predicates benefits upon length of residency within the state).

## IV.

█ In her complaint, Piper also raised a pendent state law claim, charging that Rule 42 violates New Hampshire Rev.Stat.Ann. 311:2. The district court did not decide this issue. Given the special deference due the state court in matters concerning bar regulations, and the particular awkwardness involved in our reviewing whether the state's highest court has misinterpreted a state statute, we decline to resolve this claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right.").

*Reversed.*

BOWNES, Circuit Judge (dissenting).

I dissent from the majority's opinion because I cannot accept my brothers' unwarranted deviation from the established constitutional principles that I believe should guide our decision in this case. While the majority concedes that the privileges and immunities clause is applicable to New Hampshire's attempt to restrict admission to the state bar to state residents, it shackles the thrust of the clause's command. The majority drastically reduces the burden that New Hampshire bears to justify discrimination against nonresidents by adopting a "political function" exception to the traditional privileges and immunities clause test which was established by the Supreme Court in *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), and is the law today. *See Hicklin v. Orbeck,* 437 U.S. 518, 525–28, 98 S.Ct. 2482, 2487–2488, 57 L.Ed.2d 397 (1978). Under the majority's test, when the state action at issue is "closely tied to the state's ability to function as a sovereign government," *ante* at 829, the exacting scrutiny mandated by *Toomer* and *Hicklin* is watered down to only a showing that the discrimination against nonresidents bears a rational relationship to some legitimate state goal.

I believe this approach is wrong for two reasons. First, it is unnecessary to adjust the prevailing standard of review to account for political functions; Supreme

Court jurisprudence concerning the privileges and immunities clause at present reflects a concern for the appropriate relationship between state sovereignty and interstate equality. Second, a state's regulation of admission to the bar is not a state policy that is, as the majority posits, "closely tied to the state's ability to function as a sovereign government." *Ante* at 829.

## I.

The Supreme Court has established the point at which to undertake an analysis of whether a state's discrimination against nonresidents is necessary for the state to function as a sovereign government. *See Baldwin v. Fish and Game Commission of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978). This analysis is performed by a court when determining whether the privileges and immunities clause applies to the particular discrimination at all. *See Note, A Constitutional Analysis of State Bar Residency Requirements Under the Interstate Privileges and Immunities Clause of Article IV,* 92 Harv.L. Rev. 1461, 1476 (1979).

In *Baldwin v. Fish and Game Commission of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354, the Court discussed the types of interests within the purview of the privileges and immunities clause. It noted that the clause "has been interpreted to prevent a State from imposing unreasonable burdens on citizens of other States in their pursuit of common callings within the State; in the ownership and disposition of privately held property within the State; and in access to the courts of the State." *Id.* at 383, 98 S.Ct. at 1860 (citations omitted). On the other hand, the privileges and immunities clause has never impeded a state in discriminating against noncitizens with respect to voting or qualifying for public office.

> Suffrage . . . always has been understood to be tied to an individual's identification with a particular State. *See, e.g., Dunn v. Blumstein,* 405 U.S. 330 [92 S.Ct. 995, 31 L.Ed.2d 274] (1972). No one would suggest that the Privileges and Immuni-

ties Clause requires a State to open its polls to a person who declines to assert that the State is the only one where he claims a right to vote. The same is true as to qualification for an elective office of the State. *Kanapaux v. Ellisor,* 419 U.S. 891 [95 S.Ct. 169, 42 L.Ed.2d 136] (1974); *Chimento v. Stark,* 353 F.Supp. 1211 (NH), summarily aff'd, 414 U.S. 802 [94 S.Ct. 125, 38 L.Ed.2d 39] (1973).

*Baldwin,* 436 U.S. at 383, 98 S.Ct. at 1860. Similarly, a state need not always treat residents and nonresidents equally with respect to the application of its laws and services. *Id.*

The proper approach in any case is to determine, initially, whether the discrimination against nonresidents affects an interest that "bear[s] upon the vitality of the Nation as a single entity . . . ." *Id.; see id.* at 388, 98 S.Ct. at 1862 (elk hunting not basic to maintenance or well-being of Union; interest in elk hunting not within purview of privileges and immunities clause). Once it is determined that the interest affected by the discrimination is protected by the clause, the state must then justify the discrimination under the test outlined by the Supreme Court in *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, and reaffirmed in *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397. *See Baldwin,* 436 U.S. at 385–86, 98 S.Ct. at 1861–1862 (state cannot confine state resources to own residents when, without reason, it interferes with nonresident's right to pursue livelihood; this right protected by privileges and immunities clause). A political function analysis is part of the initial determination of whether the interest affected is within the purview of the privileges and immunities clause. In deciding that the discrimination is subject to the strictures of the clause, the court necessarily determines that disparate treatment of residents and nonresidents is not essential to the preservation of the sovereign identity of the state. *See Baldwin,* 436 U.S. at 383, 98 S.Ct. at 1860 (privileges and immunities clause never applicable to right to vote and hold elective office; distinction between residents and nonresidents merely reflects

fact that this is nation composed of individual states).

The majority's approach is flawed because it reintroduces sovereignty considerations at an improper point in the privileges and immunities clause analysis. In so doing, the majority unnecessarily lessens the burden a state must bear to justify discrimination against nonresidents. If, indeed, the interest affected by the discrimination is not protected by the clause, the state need not justify any preference afforded to residents. But, if the interest is protected, the constitutional rights of an individual are at stake, and the state must bear a heavy burden to justify the infringement.

My reading of the precedent relied on by the majority reveals the absence of support for its attempt to change the proper standard of review. The majority correctly notes that *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397, suggests that precedent under the commerce clause is helpful in interpreting the privileges and immunities clause. *Id.* at 531–32, 98 S.Ct. at 2490–2491. The majority, however, looks to a line of commerce clause cases that are inapposite to a proper understanding of the privileges and immunities clause.

The commerce clause and the privileges and immunities clause are similar because both act as a limit on a state's ability to grant preferences to its own citizens to the disadvantage of noncitizens. Thus *Hicklin, id.* at 532–33, 98 S.Ct. at 2490–2491, refers to cases in which the Supreme Court, relying on the commerce clause, invalidated states' attempts to limit use of in-state resources to state residents. *Id.* at 532, 98 S.Ct. at 2491 (in *West v. Kansas Natural Gas,* 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), Court held Oklahoma's prohibition on out-of-state shipment of in-state natural gas violates commerce clause); *Hicklin,* 437 U.S. at 532, 98 S.Ct. at 2491 (in *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923), Court held West Virginia's requiring natural gas companies to prefer state residents violates commerce clause); *Hicklin,* 437 U.S. at 533, 98 S.Ct. at

2491 (in *Foster Packing Co. v. Haydel,* 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928), Court held commerce clause prohibits Louisiana's attempt to require in-state processing of indigenous shrimp as prerequisite to out-of-state shipment). The commerce clause cases relied on by the majority, *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and its progeny, *EEOC v. Wyoming,* —— U.S. ——, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), and *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), deal with limitations on the *federal* power to regulate commerce. They say *nothing* about state power or the legitimacy of state discrimination in favor of state residents.

The majority also asserts that *Leis v. Flynt,* 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (per curiam), supports reducing the burden a state bears to justify discrimination under the privileges and immunities clause in the setting of the instant case. The obvious flaw in this argument, which is noted by the majority, is that *Leis* did not discuss the privileges and immunities clause. In fact, the clause was not implicated in the case because the *pro hac vice* statute at issue did not discriminate on the basis of citizenship. The only distinction drawn was between those persons who were members of the Ohio bar and those who were not.

Nor can I find any support for the majority in the Supreme Court's reference in *Leis* to its summary affirmance in *Norfolk and Western Railway Co. v. Beatty,* 423 U.S. 1009, 96 S.Ct. 439, 46 L.Ed.2d 381 (1975), *aff'g mem.* 400 F.Supp. 234 (S.D.Ill.1975). The majority asserts that the rejection of the privileges and immunities clause claim in *Norfolk and Western* indicates that a less rigorous standard of review is applied to privileges and immunities clause cases dealing with regulation of attorneys. It argues that even if the regulations at issue ultimately had been upheld, they would have been reviewed under a far more exacting scrutiny.

This conclusion is without foundation. In *Norfolk and Western* the plaintiffs argued that they were constitutionally entitled to be represented in Illinois by out-of-state counsel. 400 F.Supp. at 236. They relied primarily on *Spanos v. Skouras Theatres Corp.,* 364 F.2d 161 (2d Cir.) (in banc), *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966), which held that a plaintiff presenting a federal claim has a constitutional right under the privileges and immunities clause to have its out-of-state counsel appear on a *pro hac vice* basis. *Id.* at 170–71. In *Norfolk and Western* the court simply rejected the notion that any such right existed. 400 F.Supp. at 237–38. The court did not give less exacting scrutiny to the claim; it gave no scrutiny at all.

## II.

Under the appropriate standards for resolving privileges and immunities clause cases, New Hampshire's bar admission restriction cannot withstand scrutiny. First, the practice of law is not within the limited political function exception to the range of interests protected by the privileges and immunities clause.

As explained by the Supreme Court in *Baldwin v. Fish and Game Commission of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354, the political function exception is a recognition that "[s]ome distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted ...." *Id.* at 383, 98 S.Ct. at 1860. There is no exhaustive list of rights that must be reserved to a state's own citizens in order to enable the state to retain its sovereign identity. In *Baldwin* the Supreme Court identified the right to vote and to hold elective office as interests that legitimately should be tied to state citizenship. Additional guidance can be found in cases recognizing a state's right to distinguish between aliens and citizens when such distinctions are necessary for the state to retain its status as a separate political community.

In a long line of Supreme Court cases aliens have mounted equal protection clause challenges to states' attempts to make citizenship a qualification for participation in a state benefit, and many of these challenges have been successful. *See, e.g., Nyquist v. Mauclet,* 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *cf. Examining Board of Engineers v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (Puerto Rico cannot make United States citizenship qualification for civil engineering license). The Supreme Court also has recognized that a state has an inherent obligation " 'to preserve the basic conception of a political community.' " *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973) (quoting *Dunn v. Blumstein,* 405 U.S. 330, 344, 92 S.Ct. 995, 1004, 31 L.Ed.2d 274 (1972)).

> [T]his power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government. There ... is "where citizenship bears some rational relationship to the special demands of the particular position."

*Sugarman,* 413 U.S. at 647, 93 S.Ct. at 2850 (quoting *Dougall v. Sugarman,* 339 F.Supp. 906, 911 (Lumbard, J., concurring)). Thus, in this limited area a state may draw lines based on affiliation with the sovereign government because of the state's special need to retain its sovereign identity. *See Cabell v. Chavez-Salido,* 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982) (probation officers); *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (public school teachers); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (police officers).

This reluctance to interfere with a state's protection of its sovereign identity serves the same purpose as the political function exception to the privileges and immunities clause. Both recognize that in certain areas a state must have a citizen's allegiance to perform properly the special functions that a state owes to its citizens. Basically, a state can require that those who govern the state or contribute to it in a uniquely sovereign way must be part of the same political community as those who are governed.

Lawyers do not fall within this special group of individuals who help the state in performing its sovereign functions. *See* Note, *supra* p. 829, at 1476–79. This conclusion was reached by the Supreme Court when it refused to allow a state to prohibit aliens from qualifying for admission to the state's bar.

> Lawyers do indeed occupy professional positions of responsibility and influence that impose on them duties correlative with their vital right of access to the courts. Moreover, by virtue of their professional aptitudes and natural interests, lawyers have been leaders in government throughout the history of our country. Yet, they are not officials of government by virtue of being lawyers. Nor does the status of holding a license to practice law place one so close to the core of the political process as to make him a formulator of government policy.

*In re Griffiths,* 413 U.S. at 729, 93 S.Ct. at 2858 (footnote omitted).

Thus, when a state seeks to limit access to the bar on the basis of citizenship, it is not entitled to the deference it would be given if the limitation were tied to its sovereign needs. Rather, a citizenship restriction for lawyers should be treated the same as any citizenship qualification that affects the economic interests of the discriminatees. *See Cabell v. Chavez-Salido,* 454 U.S. at 438–39, 102 S.Ct. at 739–740; *Ambach v. Norwick,* 441 U.S. at 76 n. 6, 99 S.Ct. at 1594 n. 6. Under the privileges and immunities clause, this means that the state must satisfy the test laid out in *Toomer* and *Hicklin.*

To justify its rule excluding nonresidents from the bar New Hampshire must show that nonresidents "constitute a peculiar source of the evil at which the [rule] is aimed," *Hicklin,* 437 U.S. at 525–26, 98 S.Ct. at 2487–2488 (quoting *Toomer,* 334 U.S. at 398, 68 S.Ct. at 1163), and that the rule is closely tailored to eradicating the evil nonresidents present. That is, that the state cannot achieve its goal through a method that would be less onerous for nonresidents. *See Hicklin,* 437 U.S. at 527–28, 98 S.Ct. at 2488–2489. New Hampshire cannot meet this burden.

The evils that New Hampshire claims nonresidents present are: (1) ignorance of local practice and rules; (2) disregard for developing a good reputation in the state; and (3) difficulty of ensuring nonresidents' availability for court proceedings and subjecting them to disciplinary action. The responsibility for these evils cannot be placed solely on nonresidents. Any new lawyer is ignorant of local practice and rules. As the district court pointed out, developing a good reputation is a function of the "heart," not the home. As to availability for court proceedings, many nonresidents are closer to New Hampshire courts than are residents. New Hampshire's long-arm statute makes it as easy for the state to reach and discipline nonresident lawyers as it is to reach and discipline residents.

Numerous less drastic and more closely tailored alternatives are available to the state. New Hampshire already requires all new lawyers to participate in a legal skills course soon after admission to the bar. Additional continuing legal education requirements could be imposed. Similarly, the state through its power to regulate members of the bar can control courtroom decorum and set standards for professional conduct and trial practice. New Hampshire has an integrated bar association to which all lawyers who have been admitted to the bar must belong. In short, as the district court found, New Hampshire cannot show that its exclusion of nonresidents from the bar is necessary to achieve any legitimate goal.

III.

Finally, even under the test laid out by the majority, New Hampshire's rule is irrational. *See Turner v. Fouche,* 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 582 (1970). While on the one hand the state claims that residence in the state is necessary to practice properly as a New Hampshire lawyer, there is no requirement that a lawyer remain a New Hampshire resident any longer than the day he or she is admitted to the bar. Thereafter, the properly admitted lawyer can live anywhere at all and still practice in New Hampshire. It is obvious that the purpose of the rule is an attempt to restrict the practice of law in New Hampshire to residents of that state. The attempt is both unconstitutional and ineffective.

In closing, I note the irony of a majority opinion written by those who are members of a bar (Massachusetts) that has no residency requirements and a dissent written by a member of the New Hampshire bar who has practiced law only in New Hampshire.

For the foregoing reasons, I think the New Hampshire rule is unconstitutional and I would affirm the judgment of the district court.