## AUSTIN ET AL. *v.* NEW HAMPSHIRE ET AL.

No. 73–2060.   Argued January 15, 1975—Decided March 19, 1975

*Charles W. Smith* argued the cause and filed a brief for appellants.

*Charles G. Cleaveland,* Assistant Attorney General of New Hampshire, argued the cause for appellees *pro hac vice.* With him on the brief were *Warren B. Rudman,* Attorney General, and *Donald W. Stever, Jr.,* Assistant Attorney General.[*]

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Appellants are residents of Maine who were employed in New Hampshire during the 1970 tax year and as such were subject to the New Hampshire Commuters Income Tax. On behalf of themselves and others similarly situated, they petitioned the New Hampshire Superior Court for a declaration that the tax violates the Privileges and Immunities and Equal Protection Clauses of the Constitutions of New Hampshire and of the United States. The cause was transferred directly to the New Hampshire Supreme Court, which upheld the tax. 114 N. H. 137, 316 A. 2d 165 (1974). We noted probable jurisdiction of the federal constitutional claims, 419 U. S. 822 (1974), and on the basis of the Privileges and Immunities Clause of Art. IV, we now reverse.

I

The New Hampshire Commuters Income Tax imposes a tax on nonresidents' New Hampshire-derived income in

---

[*]*Jon A. Lund,* Attorney General, and *Jerome S. Matus* and *Donald J. Gasink,* Assistant Attorneys General, of Maine, *Kimberly B. Cheney,* Attorney General, *Benson D. Scotch,* Deputy Attorney General, and *Charles D. Hassel,* Assistant Attorney General, of Vermont, filed a brief for the States of Maine and Vermont as *amici curiae* urging reversal.

*William F. Hyland,* Attorney General, *pro se, Stephen Skillman,* Assistant Attorney General, and *Herbert K. Glickman,* Deputy Attorney General, filed a brief for the Attorney General of New Jersey as *amicus curiae* urging affirmance.

excess of $2,000.[1] The tax rate is 4% except that if the nonresident taxpayer's State of residence would impose a lesser tax had the income been earned in that State, the New Hampshire tax is reduced to the amount of the tax that the State of residence would impose. Employers are required to withhold 4% of the nonresident's income, however, even if his home State would tax him at less than the full 4%. Any excess tax withheld is refunded to the nonresident upon his filing a New Hampshire tax return after the close of the tax year showing that he is entitled to be taxed at a rate less than 4%.

The Commuters Income Tax initially imposes a tax of 4% as well on the income earned by New Hampshire residents outside the State. It then exempts such income from the tax, however: (1) if it is taxed by the State from which it is derived; (2) if it is exempted from taxation by the State from which it is derived; or (3) if the State from which it is derived does not tax such income.[2]

---

[1] N. H. Rev. Stat. Ann. § 77–B:2 II (1971) provides:

"A tax is hereby imposed upon every taxable nonresident, which shall be levied, collected and paid annually at the rate of four percent of their New Hampshire derived income . . . less an exemption of two thousand dollars; provided, however, that if the tax hereby imposed exceeds the tax which would be imposed upon such income by the state of residence of the taxpayer, if such income were earned in such state, the tax hereby imposed shall be reduced to equal the tax which would be imposed by such other state."

[2] N. H. Rev. Stat. Ann. § 77–B:2 I (1971) provides:

"A tax is hereby imposed upon every resident of the state, which shall be levied, collected and paid annually at the rate of four percent of their income which is derived outside the state of New Hampshire . . . ; provided, however, that if such income shall be subject to a tax in the state in which it is derived, such tax shall constitute full satisfaction of the tax hereby imposed; and provided further, that if such income is exempt from taxation because of statutory or constitutional provisions in the state in which it is derived, or because the state in which it is derived does not impose an income

The effect of these imposition and exemption features is that no resident of New Hampshire is taxed on his out-of-state income. Nor is the domestic earned income of New Hampshire residents taxed. In effect, then, the State taxes only the incomes of nonresidents working in New Hampshire; [3] it is on the basis of this disparate treatment of residents and nonresidents that appellants challenge New Hampshire's right to tax their income from employment in that State.[4]

---

tax on such income, it shall be exempt from taxation under this paragraph."

[3] New Hampshire residents pay a 4.5% tax on interest (other than interest on notes and bonds of the State and on bank deposits) and dividends (other than cash dividends on stock in national banks and New Hampshire banks and thrift institutions) in excess of $600. N. H. Rev. Stat. Ann. §§ 77:1-5 (1971). Residents also pay a $10 annual "resident tax" for the use of their town or city of residence. N. H. Rev. Stat. Ann. §§ 72:1, 5-a (Supp. 1973). Other state taxes, such as those on business profits, real estate transfers, and property, are paid by residents and nonresidents alike.

State income tax revenues from the tax on residents' unearned income in fiscal year 1970 were $3,462,000. In fiscal year 1971, the first in which the State taxed the earned income of nonresidents, total income tax revenues rose to $5,238,000. U. S. Dept. of Commerce, Bureau of the Census, State Tax Collections in 1970 (Series GF70 No. 1) and in 1971 (Series GF71 No. 1), p. 26.

[4] Appellees challenge appellants' standing to maintain this action on the theory that their economic position was unchanged despite the imposition of the Commuters Income Tax because they received an offsetting credit under the tax laws of Maine, Me. Rev. Stat. Ann., Tit. 36, § 5127 (Supp. 1973), against income taxes owing to that State; the appellants' total tax liability, that is, was unaffected. We think the question is covered, however, by the holding of *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U. S. 522 (1959). In addition, appellants are affected by the requirements that they file a New Hampshire tax return and that their employers withhold 4% of their earnings; since the appellees do not suggest that appellants are subject to the tax at the 4% rate, at the very least the withholding requirement deprives them of the use value of the excess

## II

The Privileges and Immunities Clause of Art. IV, § 2, cl. 1, provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The Clause thus establishes a norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment. The origins of the Clause do reveal, however, the concerns of central import to the Framers. During the preconstitutional period, the practice of some States denying to outlanders the treatment that its citizens demanded for themselves was widespread. The fourth of the Articles of Confederation was intended to arrest this centrifugal tendency with some particularity. It provided:

> "The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof respectively."

The discriminations at which this Clause was aimed were by no means eradicated during the short life of the Con-

---

withheld over their ultimate tax liability, if any. These effects may not be substantial, but they establish appellants' status as parties "adversely affected" by the State's tax laws, giving them "a direct stake in the outcome" of this litigation. *Sierra Club* v. *Morton,* 405 U. S. 727, 740 (1972).

federation,[5] and the provision was carried over into the comity article of the Constitution in briefer form but with no change of substance or intent,[6] unless it was to strengthen the force of the Clause in fashioning a single nation.[7] Thus, in the first, and long the leading, explication of the Clause, Mr. Justice Washington, sitting as Circuit Justice, deemed the fundamental privileges and immunities protected by the Clause to be essentially coextensive with those calculated to achieve the purpose of forming a more perfect Union, including "an exemption from higher taxes or impositions than are paid by the other citizens of the state." *Corfield* v. *Coryell*, 6 F. Cas. 546, 552 (No. 3,230) (CCED Pa. 1825).

In resolving constitutional challenges to state tax measures this Court has made it clear that "in taxation, even more than in other fields, legislatures possess the greatest freedom in classification." *Madden* v. *Ken-*

---

[5] James Madison, in a commentary on the plan of union proposed by William Paterson of New Jersey, wrote: "Will it prevent trespasses of the States on each other? Of these enough has been already seen. He instanced Acts of Virga. & Maryland which give a preference to their own citizens in cases where the Citizens [of other States] are entitled to equality of privileges by the Articles of Confederation." 1 M. Farrand, Records of the Federal Convention 317 (1911).

[6] Charles Pinckney, who drafted the shorter version now found in Art. IV, § 2, cl. 1, see 37 Annals of Cong. 1129 (1821), assured the Convention that "[t]he 4th article, respecting the extending the rights of the Citizens of each State, throughout the United States [etc.] is formed exactly upon the principles of the 4th article of the present Confederation . . . ." 3 M. Farrand, *supra*, at 112. For an explanation of the deletion of certain phrases found in Art. IV of the Confederation in light of the Fugitive Slave and Commerce Clauses of the Constitution, see *Lemmon* v. *People*, 20 N. Y. 562, 627 (1860) (opinion of Wright, J.).

[7] *Id.*, at 607 (Denio, J.); see *Paul* v. *Virginia*, 8 Wall. 168, 180 (1869).

*tucky,* 309 U. S. 83, 88 (1940). See *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356 (1973). Our review of tax classifications has generally been concomitantly narrow, therefore, to fit the broad discretion vested in the state legislatures. When a tax measure is challenged as an undue burden on an activity granted special constitutional recognition, however, the appropriate degree of inquiry is that necessary to protect the competing constitutional value from erosion. See *id.,* at 359.

This consideration applies equally to the protection of individual liberties, see *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936), and to the maintenance of our constitutional federalism. See *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157, 164 (1954). The Privileges and Immunities Clause, by making noncitizenship or nonresidence [8] an improper basis for locating a special burden, implicates not only the individual's right to nondiscriminatory treatment but also, perhaps more so, the structural balance essential to the concept of federalism. Since nonresidents are not represented in the taxing State's legislative halls, cf. *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522, 532–533 (1959) (BRENNAN, J., concurring), judicial acquiescence in taxation schemes that burden them particularly would remit them to such redress as they could secure through their own State; but "to prevent [retaliation] was one of the chief ends sought to be accomplished by the adoption of the Constitution."

---

[8] For purposes of analyzing a taxing scheme under the Privileges and Immunities Clause the terms "citizen" and "resident" are essentially interchangeable. *Travis* v. *Yale & Towne Mfg. Co.,* 252 U. S. 60, 79 (1920) ("a general taxing scheme . . . if it discriminates against all non-residents, has the necessary effect of including in the discrimination those who are citizens of other States"); *Smith* v. *Loughman,* 245 N. Y. 486, 492, 157 N. E. 753, 755, cert. denied, 275 U. S. 560 (1927); see *Toomer* v. *Witsell,* 334 U. S. 385, 397 (1948).

*Travis* v. *Yale & Towne Mfg. Co.,* 252 U. S. 60, 82 (1920). Our prior cases, therefore, reflect an appropriately heightened concern for the integrity of the Privileges and Immunities Clause by erecting a standard of review substantially more rigorous than that applied to state tax distinctions among, say, forms of business organizations or different trades and professions.

The first such case was *Ward* v. *Maryland,* 12 Wall. 418 (1871), challenging a statute under which nonresidents were required to pay $300 per year for a license to trade in goods not manufactured in Maryland, while resident traders paid a fee varying from $12 to $150, depending upon the value of their inventory. The State attempted to justify this disparity as a response to the practice of "runners" from industrial States selling by sample in Maryland, free from local taxation and other overhead expenses incurred by resident merchants. It portrayed the fee as a "tax upon a particular business or trade, carried on in a particular mode," rather than a discrimination against traders from other States. Although the tax may not have been "palpably arbitrary," see *Allied Stores of Ohio, Inc.* v. *Bowers, supra,* at 530, the discrimination could not be denied and the Court held that it violated the guarantee of the Privileges and Immunities Clause against "being subjected to any higher tax or excise than that exacted by law of . . . permanent residents." [9]

In *Travellers' Insurance Co.* v. *Connecticut,* 185 U. S. 364 (1902), the Court considered a tax laid on the value of stock in local insurance corporations. The shares of

---

[9] Accord, *Toomer* v. *Witsell, supra,* at 396, where the Court held invalid another disparate licensing-fee system, citing *Ward* v. *Maryland* for the proposition that "it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of *substantial equality with the citizens of that State.*" (Emphasis added.)

nonresident stockholders were assessed at their market value, while those owned by residents were assessed at market value less the proportionate value of all real estate held by the corporation and on which it had already paid a local property tax. In analyzing the apparent discrimination thus worked against nonresidents, the Court took account of the overall distribution of the tax burden between resident and nonresident stockholders. Finding that nonresidents paid no local property taxes, while residents paid those taxes at an average rate approximating or exceeding the rate imposed by the State on nonresidents' stock, the Court upheld the scheme. While more precise equality between the two classes could have been obtained, it was "enough that the State has secured a reasonably fair distribution of burdens, and that no intentional discrimination has been made against non-residents." Their contribution to state and local property tax revenues, that is, was no more than the ratable share of their property within the State.

The principles of *Ward* and *Travellers'* were applied to taxes on nonresidents' local incomes in *Shaffer* v. *Carter*, 252 U. S. 37 (1920), and *Travis* v. *Yale & Towne Mfg. Co.*, *supra*. *Shaffer* upheld the Oklahoma tax on income derived from local property and business by a nonresident where the State also taxed the income—from wherever derived—of its own citizens. Putting aside "theoretical distinctions" and looking to "the practical effect and operation" of the scheme, the nonresident was not treated more onerously than the resident in any particular, and in fact was called upon to make no more than his ratable contribution to the support of the state government. The New York tax on residents' and nonresidents' income at issue in *Travis,* by contrast, could not be sustained when its actual effect was considered. The tax there granted personal exemptions to each resi-

dent taxpayer for himself and each dependent, but it made no similar provision for nonresidents. The disparity could not be "deemed to be counterbalanced" by an exemption for nonresidents' interest and dividend income because it was not likely "to benefit non-residents to a degree corresponding to the discrimination against them." Looking to "the concrete, the particular incidence" of the tax, therefore, the Court said of the many New Jersey and Connecticut residents who worked in New York:

> "They pursue their several occupations side by side with residents of the State of New York—in effect competing with them as to wages, salaries, and other terms of employment. Whether they must pay a tax upon the first $1,000 or $2,000 of income, while their associates and competitors who reside in New York do not, makes a substantial difference. . . . This is not a case of occasional or accidental inequality due to circumstances personal to the taxpayer . . . but a general rule, operating to the disadvantage of all non-residents . . . and favoring all residents . . . ." 252 U. S., at 80–81 (citations omitted).

## III

Against this background establishing a rule of substantial equality of treatment for the citizens of the taxing State and nonresident taxpayers, the New Hampshire Commuters Income Tax cannot be sustained. The overwhelming fact, as the State concedes, is that the tax falls exclusively on the income of nonresidents; and it is not offset even approximately by other taxes imposed upon residents alone.[10]   Rather, the argument advanced in fa-

---

[10] The $10 annual resident tax and the tax on certain unearned income in excess of $600 would rarely equal, much less exceed, the 4% tax on nonresidents' incomes over $2,000. Appellant Logan, for example, with $33,000 of New Hampshire-derived income, paid $252 in taxes to that State; a resident with the same earned income

vor of the tax is that the ultimate burden it imposes is "not more onerous in effect," *Shaffer* v. *Carter, supra,* on nonresidents because their total state tax liability is unchanged once the tax credit they receive from their State of residence is taken into account. See n. 4, *supra.* While this argument has an initial appeal, it cannot be squared with the underlying policy of comity to which the Privileges and Immunities Clause commits us.

According to the State's theory of the case, the only practical effect of the tax is to divert to New Hampshire tax revenues that would otherwise be paid to Maine, an effect entirely within Maine's power to terminate by repeal of its credit provision for income taxes paid to another State. The Maine Legislature could do this, presumably, by amending the provision so as to deny a credit for taxes paid to New Hampshire while retaining it for the other 48 States. Putting aside the acceptability of such a scheme, and the relevance of any increase in appellants' home state taxes that the diversionary effect is said to have,[11] we do not think the possibility that Maine could

---

would have paid only the $10 resident tax. Against this disparity and the disparities among nonresidents' tax rates depending on their State of residence, we find no support in the record for the assertion of the court below that the Commuters Income Tax creates no more than a "practical equality" between residents and nonresidents when the taxes paid only by residents are taken into account. "[S]omething more is required than bald assertion"—by the state court or by counsel here—to establish the validity of a taxing statute that on its face discriminates against nonresidents. *Mullaney* v. *Anderson,* 342 U. S. 415, 418 (1952).

[11] The States of Maine and Vermont, *amici curiae,* point out that at least $400,000 was diverted from Maine to New Hampshire by reason of the challenged tax and Maine's tax credit in 1971, and that the average Maine taxpayer, appellants included, thereby bore an additional burden of 40 cents in Maine taxes. While the inference is strong, we deem the present record insufficient to demonstrate that Maine taxes were actually higher than they otherwise would have been but for this revenue loss.

shield its residents from New Hampshire's tax cures the constitutional defect of the discrimination in that tax. In fact, it compounds it. For New Hampshire in effect invites appellants to induce their representatives, if they can, to retaliate against it.

A similar, though much less disruptive, invitation was extended by New York in support of the discriminatory personal exemption at issue in *Travis*. The statute granted the nonresident a credit for taxes paid to his State of residence on New York-derived income only if that State granted a substantially similar credit to New York residents subject to its income tax. New York contended that it thus "looked forward to the speedy adoption of an income tax by the adjoining States," which would eliminate the discrimination "by providing similar exemptions similarly conditioned." To this the Court responded in terms fully applicable to the present case. Referring to the anticipated legislative response of the neighboring States, it stated:

> "This, however, is wholly speculative; New York has no authority to legislate for the adjoining States; and we must pass upon its statute with respect to its effect and operation in the existing situation. . . . A State may not barter away the right, conferred upon its citizens by the Constitution of the United States, to enjoy the privileges and immunities of citizens when they go into other States. Nor can discrimination be corrected by retaliation; to prevent this was one of the chief ends sought to be accomplished by the adoption of the Constitution." 252 U. S., at 82.[12]

---

[12] Neither *Travis* nor the present case should be taken in any way to denigrate the value of reciprocity in such matters. The evil at which they are aimed is the unilateral imposition of a disadvantage upon nonresidents, not reciprocally favorable treatment of nonresidents by States that coordinate their tax laws.

Nor, we may add, can the constitutionality of one State's statutes affecting nonresidents depend upon the present configuration of the statutes of another State.

Since we dispose of this case under Art. IV, § 2, of the Constitution, we have no occasion to address the equal protection arguments directed at the disparate treatment of residents and nonresidents and at that feature of the statute that causes the rate of taxation imposed upon nonresidents to vary among them depending upon the rate established by their State of residence.

*Reversed.*

Mr. Justice Douglas took no part in the consideration or decision of this case.

Mr. Justice Blackmun, dissenting.

For me, this is a noncase. I would dismiss the appeal for want of a substantial federal question. We have far more urgent demands upon our limited time than this kind of litigation.

Because the New Hampshire income tax statutes operate in such a way that no New Hampshire resident is ultimately subjected to the State's income tax, the case at first glance appears to have some attraction. That attraction, however, is superficial and, upon careful analysis, promptly fades and disappears entirely. The reason these appellants, who are residents of Maine, not of New Hampshire, pay a New Hampshire tax is because the Maine Legislature—the appellants' own duly elected representatives—has given New Hampshire the option to divert this increment of tax (on a Maine resident's income earned in New Hampshire) from Maine to New Hampshire, and New Hampshire willingly has picked up that option. All that New Hampshire has done is what Maine specifically permits and, indeed, invites it to do. If Maine should become disenchanted with its bestowed

bounty, its legislature may change the Maine statute. The crux is the statute of Maine, not the statute of New Hampshire. The appellants, therefore, are really complaining about their own statute. It is ironic that the State of Maine, which allows the credit, has made an appearance in this case as an *amicus* urging, in effect, the denial of the credit by an adjudication of unconstitutionality of New Hampshire's statute. It seems to me that Maine should be here seeking to uphold its own legislatively devised plan or turn its attention to its own legislature.

All this is reminiscent of the federal estate tax credit for state death taxes paid, originally granted by § 301 (b) of the Revenue Act of 1924, 43 Stat. 304, and by § 301 (b) of the Revenue Act of 1926, 44 Stat. 70, and now constituting § 2011 of the Internal Revenue Code of 1954, 26 U.S.C. § 2011. States, including New Hampshire and those adjacent to it, through specific legislation, have taken advantage of the credit allowed. Me. Rev. Stat. Ann., Tit. 36, §§ 3741–3745 (1965 and Supp. 1973); Mass. Gen. Laws, c. 65A, §§ 1–7 (1969 and Supp. 1975); N. H. Rev. Stat. Ann. §§ 87:1–13 (1971); Vt. Stat. Ann., Tit. 32, §§ 7001–7005 (1970). The credit provision has been upheld against constitutional attack. *Florida* v. *Mellon,* 273 U. S. 12, 17 (1927); *Rouse* v. *United States,* 65 Ct. Cl. 749, cert. denied, 278 U. S. 638 (1928).

One wonders whether this is just a lawyers' lawsuit. Certainly, the appellants, upon prevailing today, have no direct or apparent financial gain. Relief for them from the New Hampshire income tax results only in a corresponding, *pro tanto,* increase in their Maine income tax. Dollarwise, they emerge at exactly the same point. The single difference is that their State, Maine, enjoys the tax on the New Hampshire-earned income, rather than New Hampshire. Where, then, is the injury? If there is an element of injury, it is Maine-imposed.

We waste our time, therefore, by theorizing and agonizing about the Privileges and Immunities Clause and equal protection in this case. But if that exercise in futility is nevertheless indicated, I see little merit in the appellants' quest for relief. It is settled that absolute equality is not a requisite under the Privileges and Immunities Clause. *Toomer* v. *Witsell*, 334 U. S. 385, 396 (1948); *id.*, at 408 (Frankfurter, J., concurring). And I fail to perceive unconstitutional unequal protection on New Hampshire's part. If inequality exists, it is due to differences in the respective income tax rates of the States that border upon New Hampshire.

I say again that this is a noncase, made seemingly attractive by high-sounding suggestions of inequality and unfairness. The State of Maine has the cure within its grasp, and if the cure is of importance to it and to its citizens, such as appellants, it and they should be about adjusting Maine's house rather than coming here complaining of a collateral effect of its own statute.