**Kathryn A. PIPER, Plaintiff, Appellee,**

v.

**SUPREME COURT OF NEW HAMPSHIRE, Defendant, Appellant.**

No. 82–1548.

United States Court of Appeals,
First Circuit.

Resubmitted June 8, 1983.

Decided Dec. 5, 1983.

Martin L. Gross, Sulloway, Hollis & Soden, Martha V. Gordon, Devine, Millimet, Stahl & Branch and Gregory H. Smith, Atty. Gen., Concord, N.H., on supplemental brief for defendant, appellant.

Robert A. Backus and Backus, Shea & Meyer, Manchester, N.H., on supplemental brief for plaintiff, appellee.

Before CAMPBELL, Chief Judge, COFFIN, BOWNES and BREYER, Circuit Judges.

PER CURIAM.

In this challenge to the constitutionality of Rule 42 of the Supreme Court of New Hampshire, the district court found that the rule violated the privileges and immunities clause. 539 F.Supp. 1064 (D.N.H.1982). A divided panel of this court reversed. Upon granting the petition for rehearing en banc, this court vacated the panel's judgment and withdrew the panel opinion. Upon en banc reconsideration this court is now divided 2–2. Therefore, the decision of the district court is affirmed by an equally divided vote.

We reproduce below the two en banc opinions.

BOWNES and COFFIN, Circuit Judges.

The issue in this en banc appeal is whether Rule 42 of the New Hampshire Supreme Court, requiring that applicants to the state bar establish New Hampshire residency, violates the privileges and immunities clause in article IV, § 2 of the United States Constitution.

The facts may be briefly summarized. Plaintiff-appellee Kathryn Piper lives in Lower Waterford, Vermont, within 400 yards of the New Hampshire border. In 1979, she applied for permission to sit for the February 1980 New Hampshire bar examination, and signed a statement of intent to establish residency in New Hampshire as required by Rule 42. The rule provides that a bar applicant must "either [be] a resident of the State of New Hampshire or [have] filed a statement of intention to reside in the State of New Hampshire." This is interpreted to mean that bar applicants must establish bona fide residency at the time the

oath of admission is administered.[1] *See Piper v. Supreme Court of New Hampshire,* 539 F.Supp. 1064, 1066 (D.N.H.1982). Piper received permission to take the examination, did so, and was informed on April 18, 1980, that she had passed it and would become eligible for admission to the state bar upon establishing New Hampshire residency. Piper then requested a dispensation from the residency requirement on grounds of changed personal circumstances involving the recent birth of a child. The New Hampshire Supreme Court denied her petition on December 31, 1980.

On March 22, 1982, Piper filed a complaint in the United States District Court for the District of New Hampshire alleging that the residency requirement violated various provisions of the United States Constitution including the privileges and immunities clause of article IV, § 2. The district court held that Rule 42 violated the privileges and immunities clause. *See Piper, supra.* After the first hearing of this appeal, a panel of the court, with one judge dissenting, reversed the district court and upheld the challenged rule. *Piper v. Supreme Court of New Hampshire,* 723 F.2d 98 (1st Cir.1983). Having reheard the appeal en banc, the court stands evenly divided, and the district court's judgment is reinstated.

The United States Constitution, art. IV, § 2, provides: "The Citizens of each State shall be entitled to all the Privileges and Immunities of Citizens in the several States." The purpose of the clause is not to create an open-ended category of privileges and immunities incident to national citizenship, but rather to guarantee that each state shall afford the same privileges and immunities to noncitizens or nonresidents as it does to its own citizens or residents.[2] "The section, in effect, prevents a State from discriminating against citizens of other States in favor of its own." *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 511, 59 S.Ct. 954, 962, 83 L.Ed. 1423 (1939), *cited in Baldwin v. Montana Fish & Game Comm'n,* 436 U.S. 371, 381–82, 98 S.Ct. 1852, 1859–60, 56 L.Ed.2d 354 (1978); *see also id.* at 380–81, 98 S.Ct. at 1858–59, citing *Paul v. Virginia,* 75 U.S. 168, 180, 8 Wall 168, 180, 19 L.Ed. 357 (1869).

In interpreting the privileges and immunities clause, the Supreme Court has not yet defined the precise contours of the interests protected by the clause. In *Baldwin,* however, the Court noted that the clause "has been interpreted to prevent a State from imposing unreasonable burdens on citizens of other States in their pursuit of common callings within the State; in the ownership and disposition of privately held property within the State; and in access to the courts of the State." 436 U.S. at 383, 98 S.Ct. at 1860 (citations omitted). The Court proceeded to explain that the clause applies "to basic and essential activities, interference with which would frustrate the purpose of the formation of the Union." *Id.* at 387, 98 S.Ct. at 1862. Among those protected interests, the Court clearly counted the individual's "right to pursue a livelihood in a State other than his own, a right that is protected by the Privileges and Immunities Clause. *Toomer v. Witsell,* 334 U.S. 385 [68 S.Ct. 1156, 92 L.Ed. 1460] (1948)." 436 U.S. at 386, 98 S.Ct. at 1861.

In *Baldwin,* the Court rejected a challenge to a state scheme which imposed more expensive and burdensome conditions for obtaining elk hunting licenses on nonresidents than on residents; elk hunting was characterized as "a recreation and a sport" rather than "a means to the nonresident's livelihood." *Id.* at 388, 98 S.Ct. at 1862.

---

1. Under New Hampshire law, residency consists of a domicile or place of abode within the State and a political subdivision thereof, as well as a "current intent to designate that place of abode as [the] principal place of physical presence for the indefinite future to the exclusion of all others." N.H.Rev.Stat.Ann. ch. 21, § 6.

2. It is settled that for purposes of the privileges and immunities clause the terms "citizen" and "resident" are interchangeable. *See Hicklin v. Orbeck,* 437 U.S. 518, 524 n. 8, 98 S.Ct. 2482, 2486 n. 8, 57 L.Ed.2d 397 (1978).

When dealing with residency-based discrimination that affects economic or occupational opportunities, though, the court has consistently struck down state barriers. In *Toomer,* the Court invalidated a state statute which required nonresident shrimpers to pay a licensing fee one hundred times higher than that for residents. The articulated function of the privileges and immunities clause was "to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.... [O]ne of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." 334 U.S. at 395–96, 68 S.Ct. at 1161–62. Most recently, in *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), the Court held that a state statute requiring preferential hiring for state residents in the oil and gas industry constituted "discrimination against nonresidents seeking to ply their trade, practice their occupation, or pursue a common calling within the State," and thus violated the privileges and immunities clause. The Court reaffirmed that "a resident of one State is constitutionally entitled to travel to another State for purposes of employment free from discriminatory restrictions in favor of state residents imposed by the other State." *Id.* at 524–25, 98 S.Ct. at 2486–87.

The *Hicklin* Court also perceived a "mutually reinforcing relationship" between the privileges and immunities clause and the commerce clause, stemming from their "common origin in the Fourth Article of the Articles of Confederation and their shared vision of federalism," *id.* at 531–32, 98 S.Ct. at 2490–91, and cited several commerce clause decisions to support the privileges and immunities reasoning.[3] The two clauses are indeed similar, for both limit a state's ability to afford its own residents preferential treatment at the expense of nonresidents. Analysis under either clause may lead to the same result in a given case. Nevertheless, the application and effect of the clauses are distinct. The commerce clause serves to prevent the states from interfering with regulation of interstate commerce by the federal legislature, while the privileges and immunities clause guarantees individual rights: the distinction between the prerogatives of Congress and the rights of private citizens is important. The application of the commerce clause depends on the expressed intent of Congress, which could conceivably endorse various state statutes having distorting effects on interstate commerce. By contrast, nothing within the power of Congress can abrogate the guarantees of the privileges and immunities clause. Analysis under that clause must be carried out independently.

Chief Judge Campbell invokes *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and its progeny apparently to suggest that, like congressional power to legislate under the commerce clause, the reach of the privileges and immunities clause should be limited in areas closely tied to the state's ability to function as a sovereign government. [*See Piper,* 723 F.2d at 98–102.] But, although the commerce clause and the privileges and immunities clause have the common constitutional purpose of promoting national unity, it is misleading to suggest that analysis under the two clauses is identical. Whether Congress could, under its commerce power, enact a statute that required states to admit nonresidents who otherwise met a state's bar qualifications is not the question before this court.

---

3. The *Hicklin* Court cited three cases in which the Supreme Court, relying on the commerce clause, invalidated state attempts to limit use of in-state resources to state residents. In *West v. Kansas Natural Gas,* 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), the Court held that Oklahoma's prohibition on out-of-state shipment of in-state natural gas violated the commerce clause; in *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923), the Court held that West Virginia's requirement that natural gas companies give preference to state residents violated the commerce clause; and in *Foster-Fountain Packing Co. v. Haydel,* 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928), the Court held that the commerce clause prohibited Louisiana from requiring in-state processing of indigenous shrimp as a prerequisite to shipment out of state.

*National League of Cities* found in the tenth amendment a prohibition on congressional interference under the commerce clause with matters deemed essential to the sovereignty of a state. But the tenth amendment reserves to the states only those powers not prohibited to the states by other provisions of the Constitution. Article IV, section 2 is such a provision, removing from the states the power to deny noncitizens or nonresidents those privileges and immunities that it extends to its own citizens and residents.

Under a privileges and immunities analysis, a state is not absolutely prohibited from establishing residency qualifications; certain activities closely related to a state's preservation of its sovereign identity are permitted under the clause. The Supreme Court in *Baldwin* offered the examples of voting and qualification for elective office:

> Suffrage, for example, always has been understood to be tied to an individual's identification with a particular State. See, *e.g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). No one would suggest that the Privileges and Immunities Clause requires a State to open its polls to a person who declines to assert that the State is the only one where he claims a right to vote. The same is true as to qualification for an elective office of the State. *Kanapaux v. Ellisor,* 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974); *Chimento v. Stark,* 353 F.Supp. 1211 (D.N.H.1973), *summarily aff'd* 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973).

436 U.S. at 383, 98 S.Ct. at 1860. The Court did not go on to define the extent of the sovereign identity exception to the privileges and immunities clause, but the citation to *Dunn v. Blumstein* suggests that guidance may be found in a line of equal protection decisions concerning citizenship requirements. In *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Court invalidated a state requirement that all employees in the classified civil service be United States citizens. The Court recognized that states have an "interest in establishing [their] own form of government, and

in limiting participation in that government to those who are within 'the basic conception of a political community,'" *id.* at 642, 93 S.Ct. at 2847 (quoting *Dunn,* 405 U.S. at 344, 92 S.Ct. at 1004), but found that the state's interest in preserving its separate, sovereign identity did not extend to all public employment. Instead, the Court articulated a general standard, explaining that the state could legitimately specify citizenship as a prerequisite

> not only [for] the qualifications of voters, but also [for] persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formation, execution, or review of broad public policy perform functions that go to the heart of representative government.

413 U.S. at 647, 93 S.Ct. at 2850.

Following *Sugarman,* the Court has applied the sovereign identity standard in several equal protection challenges to citizenship requirements. Within the limited area of occupations directly affecting state sovereignty interests, the Court has upheld citizenship requirements. *See, e.g., Cabell v. Chavez-Salido,* 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982) (probation officers); *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (public school teachers); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (police officers).

Outside of that area, however, the court has applied the *Sugarman* standard to strike down citizenship requirements. *See, e.g., Examining Bd. v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (civil engineers); *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (lawyers). The decision in *Griffiths* is especially helpful in the present case because it explains why lawyers, though loosely called "officers of the courts," do not fall within the range of occupations on which states may impose a citizenship requirement:

> "Certainly nothing that was said ... in any other case decided by this Court places attorneys in the same category as

marshals, bailiffs, court clerks or judges. Unlike these officials a lawyer is engaged in a private profession, important though it be to our system of justice. In general he makes his own decisions, follows his own best judgment, collects his own fees and runs his own business. The word 'officer' as it has always been applied to lawyers conveys quite a different meaning from the word 'officer' as applied to people serving as officers within the conventional meaning of that term."

413 U.S. at 728–29, 93 S.Ct. at 2858–59 (quoting *Cammer v. United States,* 350 U.S. 399, 405, 76 S.Ct. 456, 459, 100 L.Ed. 474 (1956). The Court proceeded to distinguish the bar as a profession from the political occupations that might properly be reserved for citizens:

Lawyers do indeed occupy professional positions of responsibility and influence that impose on them duties correlative with their vital right of access to the courts.... Yet, they are not officials of government by virtue of being lawyers. Nor does the status of holding a license to

practice law place one so close to the core of the political process as to make him a formulator of government policy.

*Id.* at 729, 93 S.Ct. at 2859 (footnote omitted). The *Griffiths* holding places the practice of law as such squarely outside of the range of occupations implicating state sovereignty, and leads to scrutiny of residency requirements for state bar admission on the same terms as similar requirements for any other commercial or professional livelihood.[4] *See Stalland v. South Dakota Bd. of Bar Examiners,* 530 F.Supp. 155, 158 (D.S.D. 1982); Note, *A Constitutional Analysis of State Bar Residency Requirements Under the Interstate Privileges and Immunities Clause of Article IV,* 92 Harv.L.Rev. 1461, 1468–79 (1979).

The proper standard for evaluating the privileges and immunities claim in this case is set out in *Hicklin.*[5] In order to justify its bar residency requirement, appellant must show first that nonresident members of the state bar would "constitute a peculiar source of the evil at which the [rule] is aimed," 437 U.S. at 526, 98 S.Ct. at 2487

---

**4.** The proportion of lawyers who engage in litigation is small compared to the number whose practice is devoted to the commercial aspects of modern life. As a practical matter, the activities of many, if not most, bar members are essentially commercial. It may also be noted in passing that if the New Hampshire bar residency requirement were upheld, it would, taken together with *Griffiths,* create the anomaly of a state being permitted to exclude nonresident citizens of the United States but not residents whose allegiance is to another country.

**5.** The cases holding that members of one state's bar have no constitutional due process right to argue *pro hac vice* before the courts of another state do not affect the applicability of *Hicklin* in the privileges and immunities context. *Leis v. Flynt,* 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979), dealt exclusively with a procedural due process claim, and held that no underlying substantive right under state or federal law was denied by the exclusion from the case of lawyers who had not qualified for the state's own bar. This distinction concerned members of the Ohio bar and nonmembers, not resident applicants for that bar and nonresidents. Likewise, in *Norfolk and Western Railway Co. v. Beatty,* 400 F.Supp. 234 (S.D.Ill.), *summarily aff'd,* 423 U.S. 1009, 96 S.Ct. 439, 46

L.Ed.2d 381 (1975), the district court simply found that a state rule granting the presiding court discretion as to whether to permit out-of-state counsel to appear in individual cases was not unconstitutional; no requirements for admission to the state bar were at issue, and no specific basis for the constitutional claim was mentioned.

Nor is the issue in this case foreclosed by *Wilson v. Wilson,* 416 F.Supp. 984 (D.Or.1976), *summarily aff'd,* 430 U.S. 925, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977). The district court in *Wilson* was faced with a challenge to a state bar residency requirement, but the privileges and immunities clause was not advanced as a basis for the constitutional claim. In reaching its decision, the district court considered only equal protection, due process, and right-to-travel grounds. The Supreme Court's summary affirmance has limited precedential value, and can be taken only to affirm the precise issues decided by the court below. *See Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 182–83, 99 S.Ct. 983, 989–90, 59 L.Ed.2d 230 (1979); *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Furthermore, the Supreme Court's subsequent decision in *Hicklin* drastically undermines whatever persuasive value *Wilson* might have had with respect to a privileges and immunities claim.

(quoting *Toomer,* 334 U.S. at 398, 68 S.Ct. at 1163), and further that the challenged rule's discrimination "bear[s] a substantial relationship to the particular 'evil' [that nonresidents] are said to present." 437 U.S. at 527, 98 S.Ct. at 2488; *cf. Baldwin,* 436 U.S. at 402, 98 S.Ct. at 1869 (Brennan, J., dissenting) (test is whether "the presence or activity of nonresidents is the source or cause of the problem or effect with which the State seeks to deal," and whether "the discrimination practiced against nonresidents bears a substantial relation to. the problem they present").

"It is undisputed that a State has a constitutionally permissible and substantial interest in determining whether an applicant [to the state bar] possesses 'the character and general fitness requisite for an attorney and counselor-at-law.'" *Griffiths,* 413 U.S. at 722–23, 93 S.Ct. at 2855–56 (citations omitted). The evils against which New Hampshire's residency requirement is purportedly directed do relate to the state's interest in regulating the character and general fitness of bar applicants; the inquiry under the privileges and immunities clause, however, is directed at whether those evils are categorically traceable to nonresidents. Appellant contends that nonresidents pose a peculiar threat to the quality of the state bar because (a) they are ignorant of local practice and rules, (b) they have less incentive for developing a good reputation within the state, and (c) they are difficult to reach in connection with court proceedings and disciplinary action.

There is no reason to suppose that nonresidents who have studied the same materials and passed the same examination as residents should have an inferior command of local practice and rules. It would seem instead that *any* newly qualifying lawyer would, at the outset of his activities, be hampered by lack of experience with the intricacies of state practice and procedure. *See Stalland,* 530 F.Supp. at 159–60.

As for the alleged lack of incentive to develop a good reputation, it is difficult to perceive "the relevance of citizenship to any likelihood that a lawyer will fail to protect faithfully the interest of his clients." *Griffiths,* 413 U.S. at 724, 93 S.Ct. at 2856. Professional integrity, desirable and essential as it is, cannot logically be linked with a lawyer's state of residence. Moreover, a lawyer's reputation is properly viewed as a private concern; the legal competence and ethical fitness in which the state has an interest cannot be said to depend on "cultural provincialism." *Keenan v. Board of Law Exam'rs,* 317 F.Supp. 1350, 1359 (E.D. N.C.1970).

Likewise, the problem of unavailability for court or disciplinary proceedings is not peculiar to nonresidents. Many nonresidents who live in neighboring states are located closer to New Hampshire courts than residents of outlying parts of the state. There is no ground to assume that aspirants to the bar of a given state would remain so far away for the distance to make practice especially inconvenient. Furthermore, New Hampshire's long-arm statute makes disciplinary proceedings against nonresidents no more burdensome than against residents.[6]

6. Our brethren acknowledge that the unarticulated purpose and likely effect of New Hampshire's residency requirement may consist of mere local protectionism, and they do not purport to justify this as a legitimate basis for the rule. Nor do they rely on the reasons advanced by the New Hampshire Supreme Court as constituting the "substantial reason" required under *Hicklin.* They suggest that without a protective residency requirement, a state bar would be vulnerable to domination. by out-of-state law firms which would drain the most attractive legal work away from in-state lawyers and undermine the quality and extent of legal services in the state. This argument strikes us as unduly speculative and somewhat circular. We see no reason to assume that nonresident lawyers are somehow better than residents and would, therefore, drain local practice away from native lawyers. And, if certain types of legal business call for the specialized expertise of large firms located in other states, we see no reason why that business should not be performed by the most competent lawyer available, whether that lawyer happens to reside within or without the boundaries of a given state. Our brethren's conclusion that the residency requirement is reasonable "[i]f there is a substantial reason for favoring residents over nonresidents here" merely begs

The second limb of the *Hicklin* test requires a showing that the discriminatory rule bears a *substantial* relationship to the perceived evils, and here again the New Hampshire rule cannot be upheld. The blanket exclusion of nonresidents may serve to protect the state market for legal services from outside competition, but it does not serve the stated purposes. The purported evils against which the rule is supposedly aimed bear no particular connection with the presence of nonresidents in the state bar. It should be observed as well that New Hampshire's rule does not require continuing residency, but only residency at the time of admission to the bar, combined with intent to remain. This permits bar members to leave the state after admission without forfeiting their membership, and belies the state's asserted justifications for the rule.

Indeed, far less burdensome means are available to achieve the state's legitimate ends. To ensure a basic knowledge of local practice and rules, the state may and does impose continuing legal education requirements. Similarly, standards may be set for courtroom decorum, professional conduct and trial practice, to be enforced by presiding judges and disciplinary committees. To facilitate availability for court, the state might require that nonresidents maintain an office or affiliate themselves with lawyers within the state. *See Stalland*, 530 F.Supp. at 160–61. The Supreme Court addressed the same concerns in *Griffiths:*

> [The state] has wide freedom to gauge on a case-by-case basis the fitness of an applicant to practice law. [It] can, and does, require appropriate training and familiarity with [state] law. Apart from such tests of competence, it requires a new lawyer to take both an "attorney's oath" to perform his functions faithfully and honestly and a "commissioner's oath" to "support the constitution of the United States, and the constitution of [the state]." ... [The state] may quite properly conduct a character investigation to insure in any given case "that an applicant is not one who 'swears to an oath pro forma while declaring or manifesting his disagreement with or indifference to the oath.'" Moreover, once admitted to the bar, lawyers are subject to continuing scrutiny by the organized bar and the courts. In addition to discipline for unprofessional conduct, the range of post-admission sanctions extends from judgments for contempt to criminal prosecutions and disbarment. In sum, the [bar committee] simply has not established that it must exclude all aliens from the practice of law in order to vindicate its undoubted interest in high professional standards.

413 U.S. at 726–27, 93 S.Ct. at 2857–58 (citations omitted).

A number of states have recently abandoned their own bar residency requirements. *See, e.g., Stalland,* 530 F.Supp. 155 (D.S.D.1982); *Noll v. Alaska Bar Ass'n,* 649 P.2d 241 (Alaska 1982); *Sargus v. West Virginia Bd. of Law Examiners,* 294 S.E.2d 440 (W.Va.1982); *Strauss v. Alabama State Bar,* 520 F.Supp. 173 (N.D.Ala.1981); *Sheley v. Alaska Bar Ass'n,* 620 P.2d 640 (Alaska 1980); *Gordon v. Commission on Character & Fitness,* 48 N.Y.2d 266, 422 N.Y.S.2d 641, 397 N.E.2d 1309 (1979). Whether these cases reflect the aftermath of the Supreme Court's "revitalization" of the privileges and immunities clause in *Baldwin* and *Hicklin, see generally* Note, 92 Harv.L.Rev. 1461, or the growth of nationwide law practice and law firms, the trend toward in-house counsel for national and multinational corporations, and the emergence of specialized fields extending across state lines,[7] they do show at the very least that other states have not found residency requirements necessary for effective regulation of

the question of whether residency bears a rational relationship to competence.

**7.** A sample of these burgeoning specialties would include: computer (and other high technology) law, environmental law, mergers and acquisitions, federal securities, federal tax, interstate banking, patents and trademarks, products liability, mass disaster litigation, bankruptcy, labor law, and the Uniform Commercial Code.

state bars. To permit states to impose residency requirements unrelated to a legitimate interest in the quality of bar applicants would not only violate the privileges and immunities clause, but also pave the way for more burdensome and arbitrary requirements.[8]

Because New Hampshire has not advanced valid reasons for discriminating against nonresidents with respect to bar admissions, and because its rule bears no substantial relation to its stated purposes, we would hold the rule unconstitutional, and affirm the judgment of the district court.

LEVIN H. CAMPBELL, Chief Judge, and BREYER, Circuit Judge.

The facts are adequately stated in Judge Bownes' opinion, and we need not repeat them here. Unlike our brethren, we believe that New Hampshire's bar residency requirement is constitutional.

The major difference between us and our brethren arises out of our belief that principles of federalism require giving greater weight than did the district court to the right of each state court to set bar standards, including bar residency standards.[1] The legal profession has a special relationship, grounded in the history of our nation, with the judicial branch of the state by and before which a particular lawyer is licensed to practice law. To hold that henceforth the highest court of the state lacks constitutional power to enact requirements like those embodied in New Hampshire Supreme Court Rule 42 would modify the distribution of power under our federal system in a way not contemplated in precedents construing the privileges and immunities clause.

The privileges and immunities clause of article IV of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The clause, placed alongside the commerce clause in the Constitution, was designed to serve the essential role of fusing the several states into one nation and to preserve the "structural balance essential to the concept of federalism." *Austin v. New Hampshire,* 420 U.S. 656, 662, 95 S.Ct. 1191, 1195, 43 L.Ed.2d 530 (1975). *See Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460 (1948). Towards this end, the Supreme Court has held violative of the clause "state discrimination against nonresidents seeking to ply their trade, practice their occupation, or pursue a common calling within the State." *Hicklin v. Orbeck,* 437 U.S. 518, 524, 98 S.Ct. 2482, 2486, 57 L.Ed.2d 397 (1978). In *Hicklin* the Court struck down a state law favoring qualified Alaska residents over nonresidents for jobs on the Alaska pipeline. The Court looked to whether there was a "substantial reason" for the discrimination against nonresidents. Were they the "peculiar source" of the evil at which the statute was aimed? And, was there a " '*reasonable* relationship between the danger represented by non-residents, as a *class,* and the ... discrimination.' " *Id.* at 525–26, 98 S.Ct. at 2486–87 (quoting *Toomer v. Witsell,* 334 U.S. at 398–99, 68 S.Ct. at 1163–64) (emphasis added). In our reference to *Hicklin,* we emphasize the word "class" to deflect attention from this particular plaintiff, who lives in Vermont just across the river from New Hampshire

---

**8.** It is only a short step from a residency requirement for a state to impose obligations of *pro bono* work, public lecturing, or continuing education. Although such requirements may be perfectly legitimate in moderation, they could conceivably amount to an unreasonable burden. The issue need not be decided here.

**1.** After oral argument was heard by the panel, the Supreme Court decided *District of Columbia Court of Appeals v. Feldman,* —— U.S. ——, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Appellant has suggested to us that *Feldman* requires the dismissal of the instant case for lack of jurisdiction. We disagree. *Feldman* holds that a federal district court may not sit in review of a state court's application of a bar requirement to a particular individual's case. *Feldman* indicates, however, that federal courts have jurisdiction to hear generalized constitutional challenges to state bar rules. Piper's challenge is generalized. She does not question that Rule 42 applies in her case, but rather contends that such a residency requirement is unconstitutional in all cases.

and whose admission would likely cause little trouble. Rather, the issue is whether there are good reasons that might justify New Hampshire saying to the "class" of potential applicants for the state bar who have never (as lawyers) resided in New Hampshire that they cannot practice law there. We also emphasize the word "reasonable" because it tells us that we need not hold the state to some highly stringent standard of proof. Rather, that word "reasonable" is meant to remind us that our assessment of state practices under the privileges and immunities clause is to "be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Toomer v. Witsell,* 334 U.S. at 396, 68 S.Ct. at 1162. The rights of specifically protected minorities are not at stake here.

We recognize at the outset that New Hampshire's rule may serve the less than commendable purpose of insulating New Hampshire practitioners from out-of-state competition. It may discourage those with New Hampshire legal problems from choosing lawyers residing outside New Hampshire to represent them for two reasons. First, a nonresident lawyer who is fully familiar with New Hampshire law cannot explain this latter fact to the client by pointing to bar membership. Second, the nonresident lawyer may have to pay a fee to a New Hampshire bar member to associate the bar member with the case, should a court appearance prove necessary. Were there no more to this case than local "protectionism" that would raise the cost of New Hampshire legal services, we would likely agree with our brethren. *See Hicklin v. Orbeck,* 437 U.S. at 523–24, 98 S.Ct. at 2486–87 (citing *Austin v. New Hampshire,* 420 U.S. at 660, 95 S.Ct. at 1194, and *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869)). But, our problem arises out of the fact that we see other possible purposes and consequences at stake.

It seems to us that there are consequences that a state might reasonably regard as harmful that could flow from a rule allowing those who would never live in New Hampshire, not only to appear in New Hampshire courts (which they can do anyway, *pro hac vice* without bar membership) but also to become full-fledged members of the New Hampshire bar, holding themselves out as maintaining an active law practice there. The state might reasonably fear that complete abolition of residency requirements would mean large law firms in distant states would exert significant influence upon the decisions, practices, and makeup of the New Hampshire bar. The 200-member New York City or Los Angeles firm might simply qualify one or two of their number for New Hampshire practice, dispatching them from their homes in upper Manhattan or Santa Monica as necessary to handle New Hampshire litigation. Certainly, the trends towards nationwide and specialized practice that Judge Bownes mentions suggest that this possibility is more than idle fancy. If so, law practice, at least in certain fields, could come to be dominated by out-of-state lawyers whose only connection with the state would be their desire to earn money there. And, the New Hampshire Supreme Court might well hesitate to authorize change in the composition of its bar that could allow these nonresidents a dominant voice in the bar's decisions.

For one thing, a shift of a large portion of the state's legal work to lawyers in distant states could undermine the quality and extent of the bar's voluntary public service contributions and also limit the legal services available to state residents without ready access to distant firms. The "public service" work that lawyers perform often depends upon what their peers expect of them; bench and bar simply cannot reasonably expect as great a local contribution from those who live in distant places; and a bar with a significant out-of-state component may well "expect" less of itself. Likewise, the state can reasonably be concerned that its local citizens—the intended beneficiaries of the state's legal order—should not have to travel to unknown firms in distant cities to obtain the services of the state's bar. That is to say, it may seem reasonable

to the state that some clients using out-of-state lawyers pay slightly more in order to maintain more available and affordable legal services for those citizens who must remain within the state.

For another thing, lawyers whose practice and peers are located elsewhere may tend to be less familiar with local nuance and custom. The presence of a significant out-of-state segment will tend to assimilate New Hampshire law to the law of other states. And, to the extent that differences of nuance reflect different local needs or conditions, New Hampshire's citizens will be the losers.

Finally, there is something to be said for personal familiarity with a community or region as a touchstone of one's understanding of local customs, needs, and expectations—an understanding of which makes up one significant part of the practitioner's art. To pretend that one can measure this aspect of legal skill through tests or teach it through legal education courses is to have an overabundance of faith in the academy.

The issue here as we see it is not whether a residency requirement is desirable; many states have decided it is not. Nor is the issue whether the "good" reasons for it outweigh the "bad"; that is primarily a matter for the New Hampshire Supreme Court. Rather, the question is whether we can set aside that court's determination; or whether the presence of these potentially justifying reasons provide the state with *Hicklin*'s "substantial reason" for discriminating against nonresidents. Obviously, the issue is difficult. But we conclude that the law prohibits the substitution of our own judgment for that of the New Hampshire Supreme Court for several reasons.

First, there is a special connection, recognized in law, between bar membership and a state's governmental function. The bar is part of the judiciary which, together with the executive and legislative branches, is the state government. Lawyers, as "officers of the court," are not officials capable of exercising judicial powers, *see In re Griffiths*, 413 U.S. 717, 728–29, 93 S.Ct. 2851, 2858–59, 37 L.Ed.2d 910 (1973); *Cammer v. United States*, 350 U.S. 399, 76 S.Ct. 456, 100 L.Ed. 474 (1956), but they are closely associated with, and have important responsibilities within the court system. Indeed, competent and dedicated lawyers make the state's judicial system work. The Supreme Court has recognized this "special connection" when holding that a state's interest in regulating lawyers is "especially great since lawyers are essential to the primary governmental function of administering justice . . . ." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975). *See also Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Accordingly, state bar regulations have usually been granted substantial deference by the federal courts. *See District of Columbia Court of Appeals v. Feldman*, 103 S.Ct. at 1315 n. 16; *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 2524, 73 L.Ed.2d 116 (1982) (Brennan, J., concurring).[2]

Second, as we have previously mentioned, *Toomer v. Witsell* laid down the "principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." 334 U.S. at 396, 68 S.Ct. at 1162. *Hicklin*, of course, relied on *Toomer* and stipulated that the state must come forward with "something to indicate" that noncitizens pose a special danger. 437 U.S. at 525, 98 S.Ct. at 2486 (quoting *Toomer*, 334 U.S. at 398, 68 S.Ct. at 1163). This language suggests that def-

---

**2.** Of course, a state cannot regulate its bar in such a way as to deny an applicant freedom of speech, *see Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), or equal protection of the laws. *See In re Griffith*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910. But, even when a court reviews a first amendment attack upon a state bar regulation, a federal court must be mindful that

"Admission to practice in a State and before its courts necessarily belongs to that State." *Schware*, 353 U.S. at 248, 77 S.Ct. at 761 (Frankfurter, J., concurring). *Cf. Middlesex County Ethics Committee v. Garden State Bar Association*, 102 S.Ct. 2515 (federal court should abstain from hearing first amendment challenge to a pending state ethics committee proceeding).

erence to the state's views is appropriate. We see no reason to depart from that view here, where the commercial activity involved is not *purely* private,[3] but instead a state's highest court is deciding the qualifications of those whose relation to the state's governmental function has been described (by the Supreme Court) as "special." "Deference," of course, includes upholding a view that a federal court may consider wrong, for otherwise that notion and the related power of the state to act within its constitutionally granted sphere of autonomy, would have little meaning.

Third, the Supreme Court's recent decision in *Leis v. Flynt,* 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (per curiam), supports this view. In that case two out-of-state attorneys challenged an Ohio court's refusal to grant them a hearing on their applications to appear *pro hac vice.* Although the Court did not face the precise issue now before us, its analysis shows that states are to be given considerable deference in regulating the practice of law in their state by nonresident attorneys. The Court found that the out-of-state attorneys had no federally protected right to practice law in another state. The Court stated that "Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions. The States prescribe the qualifications for admission to practice and the standards of professional conduct." *Id.* at 442, 99 S.Ct. at 700. The Court further stated that a Second Circuit case, *Spanos v.*

*Skouras Theatres Corp.,* 364 F.2d 161 (2d Cir.) (en banc), *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966), which had found a New York *pro hac vice* regulation violative of the privileges and immunities clause was "limited if not rejected entirely" by *Norfolk & Western R. Co. v. Beatty,* 423 U.S. 1009, 96 S.Ct. 439, 46 L.Ed.2d 381 (mem.), *aff'g* 400 F.Supp. 234 (S.D.Ill.1975), a case rejecting a constitutional challenge to the Illinois *pro hac vice* rule. *Leis v. Flynt,* 439 U.S. at 442 n. 4, 99 S.Ct. at 700 n. 4. This case clearly demonstrates that a very special kind of deference is due a state's regulation of law practice by those within and without its borders—and that a state's power includes placing major restrictions on out-of-state practitioners' access to its courts.

Fourth, we are judging a matter of professional qualifications under the privileges and immunities clause, art. IV, § 2, cl. 1, a question with a less direct impact on the national "common market" than cases arising under the commerce clause, art. I, § 8, cl. 3, such as *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). The New Hampshire body that made this decision was not the legislature, arguably directly responsive to in-state (but not out-of-state) political demands for economic protection; rather, it was the New Hampshire Supreme Court, insulated by the New Hampshire Constitution, pt. II, art. 73, from the direct political demands of the electorate. *Cf.* Eule, *Laying the Dormant Commerce*

---

**3.** Piper cites *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), for the argument that the practice of law is merely a form of private commercial activity. We do not believe that these cases stand for any such proposition. In *Goldfarb* the Supreme Court held that a minimum fee arrangement established by a *voluntary bar association* violated the Sherman Act, 15 U.S.C. § 1. The Court's opinion made clear that it "intend[ed] no diminution of the authority of the State to regulate its professions." 421 U.S. at 793, 95 S.Ct. at 2016. In *Bates* the Court held that a total ban on price advertising by attorneys violated the first amendment. The Court there emphasized

the narrowness of its holding, a point which was made clear in *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1925, 56 L.Ed.2d 444 (1978), which held that states can ban in-person solicitation by lawyers seeking clients for profit. Cases arising under the first amendment appear to provide little guidance on how the privileges and immunities clause should be applied to state bar regulations. The first amendment has long been applied to bar regulations. *See, e.g., Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, and the unique problem in privileges and immunities clause cases of balancing state sovereignty with national unity is not presented in the first amendment area.

*Clause to Rest,* 91 Yale L.J. 425, 427–28 (1982) (urging process-oriented interpretation of the privileges and immunities clause).

For these reasons, we believe that the federal courts are to give meaningful "leeway," *Toomer v. Witsell,* 334 U.S. at 396, 68 S.Ct. at 1162, to the New Hampshire judgment. We do not then see how a federal court can say that the New Hampshire court's fear of some adverse consequences from admitting the class of wholly out-of-state lawyers as full-fledged members of the New Hampshire bar is insubstantial. Thus we find a "substantial reason" for the rule within the meaning of *Hicklin.*

If there is a "substantial reason" for favoring residents over nonresidents here, the step New Hampshire has taken to achieve that purpose—a requirement of residency at the time of bar admission—is surely "reasonable." Several of the alternatives that our brethren suggest, such as requiring a place of business in the state, would impose greater burdens on some practitioners, without any greater impact on the likely evils. As they note, New Hampshire's residency requirement does not prevent attorneys from maintaining bar membership if they subsequently move away. But, surely the New Hampshire Supreme Court can balance competing interests and convenience in creating its rule. Its requirement establishes some commitment to continued residency in the state and provides a sensible barrier to those with no links to the state at all.[4]

Thus we believe that Rule 42 does not violate the privileges and immunities clause of the Constitution. The rule is reasonably related to furthering the state's legitimate interest in regulating the bar. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572; *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796. It satisfies the tests of *Hicklin* and *Toomer.* And, therefore, we would reverse the district court.

---

4. Piper places great emphasis upon the fact that New Hampshire does not strip an attorney of bar membership upon his moving out of state. This, she argues, makes it possible for former New Hampshire residents living elsewhere to still practice there, with the potential for defeating some or even most of the purposes New Hampshire says are served by its residency rule. But the Supreme Court of New Hampshire might have concluded that not many New Hampshire lawyers will both pull up stakes and continue to practice in the state.

And it might further believe that the bureaucracy required to keep track of such comings and goings would not be worth the trouble, especially since many moves out of state—to Washington, D.C., for example, to work for the government—may be of short duration. We do not believe the Court would have meant *Hicklin*'s "closely tailored" language to be applied with exacting scrutiny to the bar residency requirements imposed by the highest court of a state.